**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**Shakir Wadi ALKHAFAJI,
Defendant-Appellee.**

**No. 84–1080.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 5, 1984.

Decided Feb. 6, 1985.

Krupansky, Circuit Judge, filed concurring opinion.

Leonard R. Gilman, U.S. Atty., Patricia G. Reeves, Detroit, Mich., for plaintiff-appellant.

John J. Davey, argued, Madison Heights, Mich., for defendant-appellee.

Before LIVELY, Chief Judge, KRUPANSKY, Circuit Judge and CELEBREZZE, Senior Circuit Judge.

LIVELY, Chief Judge.

The question in this case is whether a disclosure requirement of the Gun Control Act of 1968, 18 U.S.C. § 921 et seq. (1982), violates the Fifth Amendment privilege against compulsory self-incrimination. More specifically, we must decide whether a conviction under 18 U.S.C. § 922(e) for delivering firearms to an airline for transportation without written notice to the carrier can withstand a Fifth Amendment challenge. This is a question of first impression in this court, and it is a question on which other courts of appeals have reached opposite conclusions.

## I.

The defendant Alkhafaji is a citizen of Iraq who has lived in this country as a resident alien since 1976. In the fall of 1982, Alkhafaji decided to return to his native country for a visit. He purchased a ticket from Pan Am for an October 21, 1982 flight from Detroit, Michigan to Bagdad, Iraq, via New York City and London, England. A few hours before boarding he checked fifteen or sixteen pieces of luggage with the airline. Acting on a tip from the Federal Bureau of Investigations, a customs inspector searched Alkhafaji's luggage and found three shotguns and eight handguns. The luggage also contained car parts and other miscellaneous items.

A grand jury for the Eastern District of Michigan indicted Alkhafaji for attempting to export firearms illegally, a violation of 22 U.S.C. § 2278 (Count One), and for delivering firearms to a common carrier without providing the carrier written notice that the firearms were in his luggage, as required by 18 U.S.C. § 922(e) (Count Two). During the trial on these charges Alkhafaji testified the shotguns and two of the handguns belonged to a friend who had been transferred unexpectedly from the Iraqi embassy in Washington to Turkey. He also testified that the remaining handguns and the car parts and other miscellaneous items in his luggage were purchased as gifts for his relatives.

A jury found Alkhafaji not guilty on Count One and guilty on Count Two. Defense counsel then filed a motion for "judgment notwithstanding the verdict,"[1] contending that Alkhafaji's prosecution for violation of 18 U.S.C. § 922(e) was barred by the Fifth Amendment to the Constitution. He supported this argument with a recent decision of the Ninth Circuit in *United States v. Flores*, 729 F.2d 593 (9th Cir. 1983), which held that requiring compliance with § 922(e) by a person illegally transporting firearms constitutes compulsory self-incrimination in violation of the Fifth

---

1. This was actually a motion for acquittal since the Criminal Rules do not provide for a motion for judgment notwithstanding the verdict. See Rule 29(c), Fed.R.Crim.P.

Amendment. At about the same time, however, the Fourth Circuit reached the opposite conclusion in *United States v. Wilson*, 721 F.2d 967 (4th Cir.1983). The district court agreed with the reasoning of the Ninth Circuit and granted defendant's motion to set aside the guilty verdict. The government appeals, urging this court to follow *Wilson* rather than *Flores*. Since this appeal was filed the Ninth Circuit has vacated its panel decision in *Flores* and granted rehearing en banc. *United States v. Flores*, 732 F.2d 1438 (9th Cir.1984).

## II.

### A.

The Supreme Court has examined a number of statutes requiring self-reporting of information that could tend to incriminate the reporter. Both the Ninth Circuit in *Flores*, and the district court in this case found § 922(e) to be similar to those statutes the Court has found to violate the Fifth Amendment privilege against compulsory self-incrimination. These include statutes requiring registration by Communist Party members, registration of sawed-off shotguns and other illegal weapons, and the taxation of gambling and marahuana transactions. The government, however, argues that § 922(e) does not have the offensive characteristics the Court found in those statutes. Rather, it contends, the statute is much more like those requiring the filing of an income tax return or requiring drivers to stop and identify themselves after an automobile accident, statutes which the Court has found do not offend the Fifth Amendment. In support of this position the government also points to court of appeals decisions which have found that reports which must be filed with the Securities and Exchange Commission (SEC), or that must be filed before taking money out of the United States, likewise do not violate the Fifth Amendment.

### B.

Alkhafaji argues that correct application of *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965), requires affirmance of the district court's judgment vacating his conviction. In *Albertson* the Supreme Court set aside an order issued by the Subversive Activities Control Board requiring the petitioners to register under the Subversive Activities Control Act of 1950. The registration form required an admission that the registrant was a member of the Communist Party of the United States and this admission could be used to prosecute the registrant under various laws which made membership in that party illegal. The Supreme Court found that the registration requirement was "inconsistent" with the guarantee against compulsory self-incrimination. In doing so, the Court emphasized several factors. First, the requirement was directed at "a highly selective group inherently suspect of criminal activities," rather than the public at large. Second, the claim of constitutional protection was "not asserted in an essentially non-criminal and regulatory area of inquiry"; rather, the inquiry took place in an area "permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of the crime." *Id.* at 79, 86 S.Ct. at 199. Finally, compliance with the requirement would create a substantial likelihood of prosecution.

The *Albertson*, criteria were applied by the Supreme Court in *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), a prosecution for failing to register a sawed-off shotgun for taxation. The Court found that the statute apparently was intended to require taxation only of "gangster type" weapons. Further, the registration requirement was part of a law which made possession and transportation of certain firearms illegal under many circumstances. It existed as part of an "area permeated with criminal statutes" rather than an area concerned primarily with government regulation in a non-criminal setting.

The Supreme Court decided two other cases on the same day as the *Haynes* deci-

sion. In *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), the Court struck down a statute making it a crime to willfully fail to pay an occupational tax on wagering and to register as one conducting wagering. There were numerous laws making wagering a crime, and the Court found that the information obtained from the registration and issuance of a wager license would be readily available to prosecutors enforcing such laws. This information, divulged on pain of prosecution, "would surely prove a significant 'link in a chain' of evidence tending to establish his guilt." *Id.* at 48, 88 S.Ct. at 703 (citations omitted). The Court also applied the *Albertson* criteria to reverse a conviction in *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968). This to, was a case involving the tax on wagering. The opinion highlighted the additional duty of one engaged in the wagering business to file monthly returns with the Internal Revenue Service on a form which revealed the details of the wagering business actually being carried on. As in *Marchetti*, the Court found that the combination of state and federal anti-gambling laws placed Grosso "entirely within 'an area permeated with criminal statutes,' where he is 'inherently suspect of criminal activities.'" *Id.* at 64, 88 S.Ct. at 712.

In *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Supreme Court reversed a conviction under the Marihuana Tax Act. Central to its determination of a Fifth Amendment violation was the finding that the purpose of the Act was to bring to light violations of the marihuana laws. Since possession of marihuana is illegal in every state, compliance with requirements of the Act would create a "real and appreciable" risk of incrimination. *Id.* at 18, 89 S.Ct. at 1539. By complying, a person identified himself as a member of a "selective" and "suspect" group, since persons legally in possession of marihuana were "virtually certain" either to be registered or to be exempt from obtaining an order form required by regulations. *Id.*

### C.

The government relies upon a group of cases in which the Supreme Court and the Second Circuit found no Fifth Amendment problem with disclosure requirements which could potentially provide some basis for a criminal prosecution.

In *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), the Supreme Court upheld the conviction of one engaged in illegal liquor traffic for willfully refusing to file an income tax return. Writing for the Court, Justice Holmes found that "the protection of the Fifth Amendment was pressed too far" in the decision of the court of appeals reversing the conviction. *Id.* at 263, 47 S.Ct. at 607. The defendant could have objected to answering specific questions on grounds of Fifth Amendment privilege, but could not refuse to file the return. "It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to state the amount of his income because it had been made in crime." *Id.* at 263–64, 47 S.Ct. at 607–08. In *Albertson* and the other cases previously discussed the Court distinguished *Sullivan* on the ground that all persons with taxable income are required to file returns, and thus, the filing requirement is not directed at a "highly selective group inherently suspect of criminal activities" and the claim of privilege in *Sullivan* was not "against an inquiry in an area permeated with criminal statutes." *Albertson*, 382 U.S. at 79, 86 S.Ct. at 199.

In *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), the Court found *Sullivan* rather than *Albertson* controlling. At issue was the question whether a state "hit and run" statute which required a driver involved in a motor vehicle accident to stop at the scene and give his name and address infringed the constitutional privilege against compulsory self-incrimination. In a plurality opinion, Chief Burger wrote:

Tension between the State's demand for disclosures and the protection of the

right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.

402 U.S. at 427, 91 S.Ct. at 1537. In conducting its close scrutiny of the California statute, the Court found the *Albertson* elements missing. All drivers of motor vehicles have the same responsibility under the law; the requirement of identifying one's self after an accident was not directed to a "selective" or "suspect" group. Moreover, involvement in an automobile accident does not ordinarily implicate any criminal activity. In addition, the purposes of the statute are non-criminal—to facilitate proper allocation of civil liabilities and to regulate the use of motor vehicles. The fact that the essentially neutral act of making the required disclosure might possibly have the collateral consequence of ultimately leading to prosecution is not sufficient:

> In order to involve the privilege it is necessary to show that the compelled disclosures will themselves confront the claimant with "substantial hazards of self-incrimination."

402 U.S. at 429, 91 S.Ct. at 1538. Justice Harlan, the author of *Albertson, Haynes, Marchetti, Grosso* and *Leary,* concurred in the judgment in *Byers.* He concluded that when a statute "operate[s] in the context of the ... collection of data for purposes essentially unrelated to criminal prosecution," *id.* at 436, 91 S.Ct. at 1542, "the presence of a 'real' and not 'imaginary' risk of self-incrimination is not a sufficient predicate for extending the privilege against self-incrimination" to such a regulatory scheme. *Id.* at 439, 91 S.Ct. at 1543.

The Second Circuit has found *Byers* controlling in upholding convictions under two quite different statutes which require potentially incriminating disclosures. In *United States v. Stirling,* 571 F.2d 708 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), the court affirmed a conviction for securities fraud. The de-fendants maintained that if they had disclosed the true facts surrounding certain transactions to the SEC and the public they would have been admitting sufficient facts to form a basis for criminal prosecution under federal labor laws. The court rejected this argument and conducted the "close scrutiny" dictated by *Byers,* using the balancing approach described in that decision. The court concluded that this balancing requires a finding that an "essentially regulatory statute" does not violate the Fifth Amendment privilege against self-incrimination where four conditions are found to exist: (1) self-reporting is essential to fulfillment of the regulatory objective, (2) the burden of disclosure is placed on the general public rather than a selective, suspect group, (3) the general activity is lawful and (4) the possibility of incrimination is not substantial. The court also pointed out that *Byers* held that the possibility that disclosed information might be "a link in the chain" of evidence leading to prosecution and conviction is not a sufficient basis for finding an infringement. 571 F.2d at 728.

The offense in *United States v. Dichne,* 612 F.2d 632 (2d Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980), was failure to report to United States Customs the transportation out of the United States of "monetary instruments" having a value in excess of $5,000 as required by the Bank Secrecy Act. The court analyzed the reporting requirement under both the *Albertson* line of cases and under *Byers* and concluded that it was not inconsistent with the guarantee against compulsory self-incrimination. Important considerations were the fact that the transportation of money out of the United States is not itself illegal and that the majority of persons required to make the report would have no involvement in criminal activity. Thus the reporting requirement is not aimed at an "inherently suspect group" and it does not involve an area "permeated with criminal statutes." The court distinguished *Haynes* because the statute involved there required reports only with respect to weapons principally used in unlaw-

ful activities. The court found the legitimate regulatory, noncriminal interest of the government to be substantial and that the reporting requirements do not involve a "direct link to any related criminal activity." *Id.* at 640.

### III.

The statute under which Alkhafaji was convicted, 18 U.S.C. § 922(e), provides:

It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; except that any passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter.

### A.

On appeal the government argues that the district court properly identified the controlling criteria from *Albertson* but misapplied the law in this case. This case is governed by *Byers*, the government contends, because the notice requirement of § 922(e) is directed to all persons who transport firearms, not to a "selective" or "inherently suspect" group. The mistake of the district court, and of the panel in *Flores*, according to the government, was that they concentrated on the criminal activity of the defendant. The analysis in *Byers* centered on the class to whom the reporting requirement applies, not on the individual challenging the statute. Since

many people are permitted to own and legally transport firearms, compliance by most people with the notice requirement would reveal no criminal activity. Under this approach it is immaterial that Alkhafaji was not typical of the broad class at whom the statute is directed.

The government buttresses its argument by reference to *Stirling* and *Dichne*. In both cases the defendants who failed to make the required disclosures were engaged in criminal activities. Nevertheless, the court focused on the nature of the entire group subject to the disclosure requirement and found in each case that this group encompassed a large number of people who were engaged in no unlawful activity. Thus, most of the required reports would have provided no evidence of criminal activity, though truthful disclosures would have provided facts tending to incriminate the defendants who challenged the statutes.

The government urges us to adopt the rational of *Wilson*. In *Wilson* the court acknowledged that the requirement of notice by one transporting firearms falls within an "area permeated with criminal statutes." Nevertheless, the requirement is directed to all passengers on common carriers, not just to those engaged in illegal transportation of weapons. Thus it is not aimed at an inherently suspect group. The *Wilson* court examined the legislative history of § 922(e) and concluded that "its primary purpose was not the apprehension of illegal arms dealers; rather, it was designed to enable common carriers to fulfill more effectively their own statutory responsibilities under § 922(f) [to not transport firearms or ammunition if there is reasonable cause to believe such transportation would violate provisions of the Act]." *Wilson*, 721 F.2d at 974. This view of the Act is buttressed by the fact that the report is required to be made to the common carrier, not to the government. "The mere possibility that a common carrier might provide incriminating information to the government, we find, does not render convictions for failure to give notice under

§ 922(e) unconstitutional." *Id.* (footnote omitted).

The government asserts that only one of the three *Albertson* criteria is met in § 922(e)—it exists in an area "permeated with criminal statutes." However, it is primarily a regulatory, not a criminal provision. Significantly, upon receiving the required report a common carrier need not notify the government; it can fulfill its legal obligation by refusing the shipment. Thus, there is no substantial likelihood that the report will lead to a criminal prosecution. Finally, the government argues, § 922(e) is not directed at a "highly selective and inherently suspect" group, the "most important factor" under the *Byers* analysis.

#### B.

Alkhafaji relies principally upon *Flores* and argues that the panel decision in that case correctly applied the tests of *Albertson* and its progeny. He reminds the court that the Fifth Amendment privilege against compulsory self-incrimination is fundamental to our system of justice and should be given "a liberal construction in favor of the right it was intended to secure." Turning to the conflicting court of appeals decisions, Alkhafaji submits that only *Flores* is sound and that *Wilson* errors in not distinguishing *Byers* as concerning a noncriminal act—involvement in an automobile accident. Alkhafaji concludes that the California reporting requirement in *Byers* involves none of the *Albertson* factors while § 922(e) implicates all of them.

#### VI.

It seems clear to us that § 922(e) falls somewhere between the statutes considered in the *Albertson* line and the one at issue in *Byers*. Though it is primarily a regulatory statute, it does reflect congressional concern with weapons and ammunition, an area permeated with criminal statutes. However, all persons who ship firearms or ammunition to someone other than a licensed importer, dealer, manufacturer or collector are required to give written notice to the carrier, with passengers being permitted to deliver legally possessed weapons and ammunition to a representative of the carrier in lieu of the written notice. Many people who would fall into this group would not be acting unlawfully. It cannot be said that this requirement is directed at a "highly selective and inherently suspect" group of people. This general requirement cannot be held to violate an individual passenger or shipper's constitutional right solely because compliance might supply evidence of other criminal activity.

The disclosure statutes in *Albertson, Marchetti, Haynes, Grosso* and *Leary,* had as their primary purpose facilitation of the enforcement of particular criminal laws. This is not the case with § 922(e). It is primarily a regulatory statute, enacted to assist common carriers in their duty not to transport weapons and ammunition under conditions which violate other laws. This purpose is expressed in the legislative history. See H.Rep. No. 1557, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 4410, 4420 (refers to § 922(e) as Section 922(d)). At least one other court of appeals has found the same legislative purpose as the *Wilson* court. See *United States v. One Heckler-Koch Rifle,* 629 F.2d 1250, 1254 (7th Cir.1980):

> Section 922(e) was enacted in order to inform the carrier of the character of the items it was shipping thus placing on it the duty to inquire into the legality of the shipment.

We think it is significant that all of the statutes considered in *Albertson* and like cases required a report to a government agency. In contrast, § 922(e) requires a report only to the carrier. Though carriers may pass such reports along to governmental agencies concerned with enforcement of other laws relating to firearms, they are not required to do so. The carriers fulfill their responsibility by refusing to accept the firearms or ammunition for transportation if inquiry reveals that such transportation would be unlawful. Under these circumstances, the likelihood that required

disclosures will be incriminating is much less substantial. In *Byers* the Court, after referring to many instances in which an organized society imposes the burden of providing information with respect to matters of public concern, wrote:

> In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holdings the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.

402 U.S. at 428, 91 S.Ct. at 1538.

Giving due regard to all the considerations discussed in the Supreme Court decisions we conclude that the district court erroneously set aside the jury's verdict. Section 922(e) is not inconsistent with the Fifth Amendment privilege against compulsory self-incrimination.[2]

Having determined that the Fifth Amendment argument was not well taken we need not consider the government's contention that Alkhafaji waived this defense by not presenting it in a timely manner.

The judgment of the district court is reversed, and the case is remanded for entry of judgment in accordance with the jury's verdict.

KRUPANSKY, Circuit Judge, concurring in the result.

I concur, however, for reasons other than those so concisely articulated by my associates of the majority.

Initially, the fifth amendment assures that "[n]o person ... shall be compelled in any criminal case to be a witness against himself". In addressing fifth amendment claims, the Supreme Court has long instructed that the privilege against self-incrimination must be liberally construed. *See, e.g., Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). *See also United States v. White,* 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944) ("[t]he immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime").

In 1965, the Supreme Court unanimously announced that the provisions of the Subversive Activities Control Act of 1950, 50 U.S.C. § 786 (1964), which required members of the Communist Party to register with the Attorney General of the United States, violated the privilege against compelled self-incrimination. *Albertson v. Subversive Activities Control Board,* 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965). *Albertson* was not a criminal prosecution but was initiated on the petitions of Party members seeking judicial review of the registration requirements.

The challenged statutory reporting procedure in *Albertson* entailed the completion

---

**2.** In the text of the concurring opinion immediately preceding footnote 6, and in that footnote, Judge Krupansky concludes that § 922(e) on its face violates the Fifth Amendment rights of those required to report thereunder. This conclusion is based on a misreading of the statute. As we read § 922, some shipments to unlicensed persons are allowed so long as the notice requirement is complied with. Unless the shipment is by *one engaged in the business of importing, manufacturing or dealing in firearms* who has not been licensed, the shipment may legally be made even to an unlicensed recipient so long as the required notice is given and the shipment does not otherwise violate a specific provision of § 922 (*e.g.,* § 922(a)(4), transportation of a destructive device, machine gun or

sawed-off shotgun or rifle; § 922(g), transportation by a felon, fugitive, drug addict or mentally incompetent person). If any such provision applied, disclosure of the shipment would not, by itself, establish guilt. The government would be required to prove that the shipment violated one of the specific prohibitions contained in § 922. Thus the reporting requirement does not violate the Fifth Amendment privilege on its face. If Alkhafaji's testimony were accepted, that he was carrying some of the weapons as a favor for a friend and the others as gifts for family members and friends, the transportation of the firearms would not have violated the Gun Control Act of 1968. His only illegal act was failing either to notify Pan Am or to turn the weapons over to the carrier's representative.

of two forms, IS–52a and IS–52. Form IS–52a compelled an affirmative disclosure that the registrant was a Communist Party member. *Albertson* concluded that the fifth amendment voided registration requirements when the fact admitted "may be used to prosecute the registrant". 382 U.S. at 77, 86 S.Ct. at 198. Because "mere association with the Communist Party presents [a] sufficient threat of prosecution", the government was not permitted to compel the statement in IS–52a. 382 U.S. at 77, 86 S.Ct. at 198.

It was essential to the conclusion of unconstitutionality that the compelled testimony amounted to a virtual admission of criminal activity. As noted by the *Albertson* Court, membership in the Communist Party could have violated the membership clause of the Smith Act, 18 U.S.C. § 2385 (1964). That Act, as pertinent, made it a felony to sustain membership in any organization which advocated the overthrow of the government of the United States by force or violence. The basic principle apparent from the *Albertson* IS–52a issue was that no citizen could be constitutionally compelled to admit to that which, by its own force, was the foundation of a criminal violation.[1]

Under the subversives act registrants were also directed to execute and file Form IS–52 which was a factual inquiry and required a subject to identify the organizations in which membership was maintained, aliases used, the date and place of birth, business and residential addresses, and positions of responsibility occupied in the suspect organizations. The *Albertson* petitioners had refused to file Form IS–52.

The government argued to the Supreme Court in *Albertson* that the petitioners could appropriately assert a privilege as to some questions, but could not refuse to file the registration statement. 382 U.S. at 78, 86 S.Ct. at 199. The government relied on *United States v. Sullivan*, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (Holmes, J.), by analogy.

In *United States v. Sullivan*, Manly S. Sullivan had refused to file an income tax return, imposing a fifth amendment privilege. It appeared that Sullivan's income was derived entirely from the illegal activity of bootlegging. The appeals court reversed his tax evasion conviction stating that under the fifth amendment, Sullivan could not be compelled to report his illegally generated income. The Supreme Court unanimously reversed. Initially, the Court noted, it was clear that the Congress intended to tax income "derived from any source whatever". The Court thus reaffirmed the venerable principle that the unlawfulness of the activity in and of itself did not preclude its taxation. *Cf. License Tax Cases*, 5 Wall. 462, 469, 18 L.Ed. 497 (1866). However, the Court in addressing the defendant's claim of the constitutional privilege to avoid reporting his income, concluded that "the protection of the Fifth Amendment [invoked by defendant] pressed too far", 274 U.S. at 263, 47 S.Ct. at 607, and that the tax return was properly compelled. If there was information required by the form that infringed a privilege, the taxpayer "could have raised the objection in the return, but could not on that account refuse to make any return at all". 274 U.S. at 263, 47 S.Ct. at 607. The taxpayer, however, could not subjectively and unilaterally declare the return unconstitutional:

---

1. The salient discussion of the *Albertson* Court, 382 U.S. 77–78, 86 S.Ct. at 198, communicates the Supreme Court's perception that the result was self-evident. The entire relevant analysis, omitting the citations, was that:

    The risks of incrimination which the petitioners take in registering are obvious. Form IS–52a requires an admission of membership in the Communist Party. Such an admission of membership may be used to prosecute the registrant under the membership clause of the

Smith Act, ... or under ... the Subversive Activities Control Act ..., to mention only two federal criminal statutes. Accordingly, we have held that mere association with the Communist Party presents sufficient threat of prosecution to support a claim of privilege.... It follows that the requirement to accomplish registration by completing and filing Form IS–52a is inconsistent with the protection of the self-incrimination Clause.

It would be an extreme if not an extravagant application of the Fifth Amendment to say that it authorized a man to refuse to *state the amount of his income* because it had been made in crime. But if the defendant desired to test that or any other point he should have tested it in the return so that it could be passed upon. He could not draw a conjurer's circle around the whole matter by his own declaration that to write *any* word upon the government blank would bring him into danger of the law.

274 U.S. at 263–64, 47 S.Ct. at 607–08 (emphasis added). The challenged "admission" in *Sullivan* was merely the report of income regardless of source; thus the tax form did not, obviously at least, mandate the taxpayer to admit a criminal involvement.

In *Albertson,* the Supreme Court rejected the government's reliance on *Sullivan* because, "[l]ike the admission of Party membership demanded by Form IS–52a, the information called for by Form IS–52 ... might be used as evidence in or at least supply investigatory leads to a criminal prosecution". 382 U.S. at 78, 86 S.Ct. at 193. Examining the two forms, the tax return in *Sullivan* and the registration form in *Albertson,* the Supreme Court, in rejecting the relevance of *Sullivan,* articulated the distinctions which compelled different fifth amendment results and which controlled the procedure by which a citizen could join the issue. Prime among the differences was the facial impact of the

inquiries—the tax form mandated responses racially neutral in the fifth amendment sense, while "the pervasive effect of the information called for by Form IS–52 is incriminatory". 382 U.S. at 79, 86 S.Ct. at 199. Elaborating on that theme, the Supreme Court stated:

In Sullivan the questions in the income tax return were neutral on their face and directed at the public at large, but here they are directed at a highly selective group inherently suspect of criminal activities. Petitioners' claims are not asserted in an essentially noncriminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context might involve the petitioners in the admission of a crucial element of a crime.[2]

The next significant discussion of fifth amendment challenges to self-reporting statutes occurred in 1968 when the Supreme Court, *per* Justice John M. Harlan, decided three cases: *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); and *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968).

In *Marchetti* the petitioner had been convicted of failing to pay an occupational tax and of failing to register with the federal government before engaging in the business of accepting wagers. After the ver-

**2.** A final twist to the *Albertson* case bears mention. Section 4(f) of the Subversive Activities Control Act of 1950 granted use immunity relative to the registration statements challenged in that case; it also declared that Communist Party membership *simpliciter* could not constitute a violation of the Act "or of any other criminal statute". The Court rejected this "immunity bath" as only slightly more than constitutional windowdressing:

It does not preclude any use of the information called for by Form IS–52, either as evidence or as an investigatory lead. With regard to the act of registering on Form IS–52a, § 4(f) provides only that the admission of Party membership thus required shall not *per se* constitute a violation [of the Act], or any other criminal statute ...; it does not pre-

clude the use of the admission as an investigatory lead, a use which is barred by the privilege.

382 U.S. at 80, 86 S.Ct. at 199–200 (citing *Counselman v. Hitchcock, supra,* 142 U.S. at 564–65, 12 S.Ct. at 198–99). In the most technical sense, then, the admission of Party membership might be characterized as facially neutral. But that is so only under a technical view of *Albertson.* To sustain a conviction under the subversives and Smith acts, in addition to the registration, the government would be required to also introduce evidence that the Party advocated the violent overthrow of the United States government, which the *Albertson* Court considered (and history confirms) was a largely *pro forma* proof. *See also* 382 U.S. at 77–78, 86 S.Ct. at 198 (quoted *supra* n. 1).

dict petitioner unsuccessfully moved to arrest the judgment charging that the statutory violations supporting the conviction violated his fifth amendment privilege against self-incrimination. The appeals court affirmed the conviction and *certiorari* was granted. *Costello v. United States*, 338 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966). The Supreme Court concluded that the tax provisions demanding registration of and levying occupational taxes on a gambling enterprise "may not be employed to punish criminally those persons who have defended a failure to comply with their requirements with a proper assertion of the privilege against self-incrimination". 390 U.S. at 42, 88 S.Ct. at 699.

The federal wagering tax statutes under which Marchetti had been convicted imposed a 10% excise tax on the gross value of the wagers accepted by all gambling operations. Most of the legalized gambling operations licensed by the states were expressly excluded from the tax. 26 U.S.C. § 4402 (1964 Ed.Supp. II). In addition, § 4411 levied on those obligated to pay the excise tax, as well as on individuals who received wagers on behalf of those subjected to the excise tax, an annual occupational tax of $50.00.

Marchetti was convicted of violating § 4412 of Title 26. Section 4412 compelled all individuals subject to the occupational tax to register each year with the district director of the internal revenue division in their respective areas. This was to be accomplished through completion of I.R.S. Form 11-C which compelled an admission of participating in the business of accepting wagers, and required registrants to disclose their residence and business addresses, and the names and addresses of their employees. Form 11-C constituted the tax return for the occupational assessment. The wagering tax statutes specifically provided that registration and payment of the occupational tax did not "exempt any person from any penalty provided by a law of the United States or of any State for engaging" in the predicate gambling enterprise. 26 U.S.C. § 4422.

In addressing the fifth amendment claim posited by Marchetti, the Supreme Court initially examined the facial implications of Form 11-C. The Court held that the protections of the fifth amendment would invalidate the tax and registration statutes if by compliance an individual "is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination". *Marchetti v. United States*, 390 U.S. at 53, 88 S.Ct. at 705. One test of the applicability of this standard was stated as whether "[p]rospective registrants can reasonably expect that registration and payment of the occupational tax will significantly enhance the likelihood of their prosecution for future acts, and that it will readily provide evidence which will facilitate their convictions". *Marchetti v. United States*, 390 U.S. at 54, 88 S.Ct. at 706. This formulation, which mandated a reasonable expectation that the likelihood of prosecution be significantly enhanced, was the long-standing statement of the test for fifth amendment infringements. *See, e.g., Brown v. Walker*, 161 U.S. 591, 598–601, 16 S.Ct. 644, 647–48, 40 L.Ed. 819 (1896), *cited in Marchetti v. United States*, 390 U.S. at 53, 88 S.Ct. at 697.

In *Marchetti* the Court observed that the taxable activities demanded by the federal enactments to be disclosed *per* Form 11-C could form the basis for criminal penalties in every state as well as the District of Columbia. Referring to *Albertson v. Subversive Activities Control Board, supra,* the *Marchetti* Court noted that the registration admissions were therefore imbued with criminality. 390 U.S. at 47, 88 S.Ct. at 702. Unlike the facially neutral tax return inquiries at issue in *United States v. Sullivan, supra,* the singular effect of I.R.S. Form 11-C (and probable purpose) was to compel from Marchetti "information which he might reasonably suppose would be available to prosecuting authorities, and which would surely prove a *significant* 'link in a chain' of evidence tending to establish his guilt". *Marchetti v. United States*, 390 U.S. at 48, 88 S.Ct. at 703. "In these circumstances," the Supreme Court ruled, "it can scarcely be denied that the

obligations to register and to pay the occupational tax created for petitioner 'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination". *Marchetti v. United States*, 390 U.S. at 48, 88 S.Ct. at 702 (citing, *inter alia, Brown v. Walker, supra*).

In *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) (Harlan, J.), issued the same day as *Marchetti,* the petitioner was also convicted of violating the federal wagering tax acts. Grosso, however, elected to assert the fifth amendment only as to his conviction for failure to pay the 10% excise tax. The Supreme Court referred to *Marchetti* and cast the privilege issue as "whether payment of the excise would have provided information incriminating to petitioner". *Grosso v. United States*, 390 U.S. at 65, 88 S.Ct. at 712.

After noting that Grosso would, under the laws of his state, be subject to criminal prosecution for the acts which obliged him to pay the tax, the Court concluded that Grosso's compliance with the tax act entailed sufficient "hazards of incrimination" to allow the fifth amendment privilege to defeat his conviction for avoiding the payment of the excise tax. 390 U.S. at 66, 88 S.Ct. 713. Tracking the discussion undertaken in *Marchetti,* the *Grosso* Court concluded that the protection against government compelled self-incriminating testimony obtains if criminal penalties arising as a result of compliance were not "remote possibilities out of the ordinary course of law". *Id.* (quoting *Heike v. United States*, 227 U.S. 131, 144, 33 S.Ct. 226, 228, 57 L.Ed. 450 (1913) (Holmes, J.)).

The remote possibility of criminal prosecution was also a dispositive inquiry in the third of the 1968 Harlan self-incrimination decisions, *Haynes v. United States*, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). The petitioner in *Haynes* was not convicted under an income tax statute, but was brought to bar for failing to register an illegally obtained and possessed firearm.[3]

The pertinent registration requirements at issue in *Haynes* were designed to ensure that only weapons of "the type it was thought would be used primarily by the gangster-type element" would be subject to its provisions. H.R.Rep. No. 914, 86th Cong., 1st Sess., 2, *quoted in Haynes v. United States*, 390 U.S. at 87 n. 4, 88 S.Ct. at 725 n. 4.

The obligation to register was conditioned upon possession *simpliciter* of a covered firearm. Not all who possessed the firearm were, however, required to register. The act excluded from compelled registration those who made the firearm, or who acquired it by transfer if the transfer and manufacture of the firearm were accomplished in satisfaction of the act's other provisions. If those requirements were not satisfied, or if the gun was not possessed by one who made it or acquired it by transfer, registration was mandated. The registrant had to provide the federal government with the registrant's name, address, the place the firearm was usually kept, the registrant's place of employment, date of birth, social security number, and record of criminal convictions. A full description of the firearm was also to be supplied. With only Chief Justice Warren dissenting, the Supreme Court concluded that this firearm registration scheme, codified at 26 U.S.C. § 5841, substantially increased the likelihood of prosecution for those who complied. Since registration was required of those firearms not constructed or transferred in accord with the provisions of the federal statutes (26 U.S.C. §§ 5851, 5861), the possessor was effectively compelled to register a criminal possession:

> The registration requirement is thus directed principally at those persons who have obtained possession of a firearm without complying with the Act's other requirements, and who are therefore immediately threatened by criminal prosecutions under §§ 5851 and 5861. They

---

**3.** A stamp tax assessed on subject guns was the foundation of the federal registration require-

ment.

are unmistakably persons "inherently suspect of criminal activities." It is true, as the United States emphasizes, that registration is not invariably indicative of a violation of the Act's requirements; there are situations, which the United States itself styles "uncommon," in which a possessor who has not violated the Act's other provisions is obliged to register. Nonetheless, the correlation between obligations to register violations can only be regarded as exceedingly high, and a prospective registrant realistically can expect that registration will substantially increase the likelihood of his prosecution. Moreover, he can reasonably fear that the possession established by his registration will facilitate his prosecution under the making and transfer clauses of § 5851. In these circumstances, it can scarcely be said that the risks of criminal prosecution confronted by prospective registrants are "remote possibilities out of the ordinary course of law"; yet they are compelled, on pain of criminal prosecution, to provide to the secretary both a formal acknowledgement of their possession of firearms, and supplementary information likely to facilitate their arrest and eventual conviction. The hazards of incrimination created by the registration requirement can thus only be termed "real and appreciable."

*Haynes v. United States*, 390 U.S. at 96–97, 88 S.Ct. at 730 (footnotes and citations deleted).

The next significant explication of this issue is in *California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). [*Byers*, it should be noted, does not present the analysis of the majority of the Supreme Court, although a 5 to 4 majority concurred in the result. The plurality opinion of the Chief Justice was joined by Justices Stewart, White, and Blackmun. Justice Harlan concurred in the result only and issued a separate opinion. Justices Black, Douglas, Brennan, and Marshall dissented.] Byers was charged in California court of violating the state's motor vehicle code for failing to stop and identify himself after being in-

volved in an automobile accident which caused property damage. He convinced the state supreme court that the statutory compulsion to stop and identify himself as the driver of a vehicle involved in an accident violated his federal constitutional protection against self-incrimination. The judgment of the Supreme Court, *per* opinions by Chief Justice Burger and Justice Harlan, was that the California stop and identify statute survived the assertion of the fifth amendment rights of drivers required to comply.

The opinion issued by the Chief Justice noted that the statutory purpose was not criminal and that any admission thereunder was not, on its face, the admission of any criminal activity. The state statute, the Chief Justice pointed out, merely required the subject driver to identify himself as a "driver"; driving, unlike the gambling activity in *Marchetti* and *Grosso*, was not generally perceived as a criminal activity. In fact, not even the subclass of "drivers involved in accidents" comprised a select group implicated in criminal conduct since most accidents were negligent and not criminal in nature.

The Chief Justice urged it significant that the compelled disclosure "identifies but does not by itself implicate anyone in criminal conduct", 402 U.S. at 434, 91 S.Ct. at 1541, and likened the statutory requirement to "stop and identify" to the requirement to file an income tax return:

Although identity, when made known, may lead to inquiry that in turn leads to arrest and charge, those developments depend on different factors and independent evidence. Here the compelled disclosure of identity could have led to a charge that might not have been made had the driver fled the scene; but this is true only in the same sense that a taxpayer can be charged on the basis of the contents of a tax return or failure to file an income tax form. There is no constitutional right to refuse to file an income tax return or to flee the scene of an accident in order to avoid the possibility of legal involvement.

*Id.* Unlike the gambling tax and firearm registration cases, the disclosure of one's name and address was, to the Chief Justice, "an essentially neutral act" which did not implicate the fifth amendment. 402 U.S. at 432, 91 S.Ct. at 1540. (For that reason the Chief Justice questioned whether the statutory disclosure was at all testimonial in the fifth amendment sense. *See generally* 402 U.S. at 431–33, 91 S.Ct. 1539–1540.)

Justice Harlan noted that the California statute did, in fact, significantly increase the chance that a complying driver would be subject to criminal sanctions; this was so, in those cases involving criminal violations, simply because absent self-reporting the state would probably be unable to identify a meaningful percentage of the drivers involved in such conduct. Justice Harlan, in a complex and thoughtful analysis, attempted to demarcate the interests implicated by a fifth amendment challenge to a government compelled disclosure. Expositive of the resulting tension in the self-incrimination decisions of the Court (as discussed by Justice Harlan) are the truisms that the availability of the protection against compelled disclosure is not limited to situations in which the purpose and clear effect of the government's inquiry is to obtain an incriminating response, *cf.* 402 U.S. at 436–37, 91 S.Ct. at 1542, and that, simply because a compelled response could eventually connect with a criminal prosecution the fifth amendment does not preclude the inquiry and mandated response, *see generally* 402 U.S. at 439–443, n. 3, 91 S.Ct. at 1543–1545, n. 3.

Justice Harlan did not so much enunciate an answer to the dilemma as he did frame the issues. Like the Chief Justice, he focused on the regulatory and non-criminal nature of the California stop and identify statute; unlike the Chief Justice, Justice Harlan concluded that a fifth amendment infringement was inferred by the compelled self-reporting and he suggested it was intellectually dishonest to conclude otherwise. Justice Harlan was certain the state statute was constitutionally valid, and struggled to suggest a fifth amendment analysis which would incorporate such enactments:

These [fifth amendment] values are implicated by governmental compulsion to disclose information about driving behavior as part of a regulatory scheme including criminal sanctions. The privacy interest is directly implicated, while the interest in preserving a commitment to the "accusatorial" system is implicated in the more attentuated sense that an officialdom which has available to it the benefits of a self-reporting scheme may be encouraged to rely upon the scheme for all governmental purposes. But, as I have argued, it is also true that, unlike the ordinary civil lawsuit context, special governmental interests in addition to the deterrence of antisocial behavior by use of criminal sanctions are affected by extension of the privilege to this regulatory context. If the privilege is extended to the circumstances of this case, it must, I think, be potentially available in every instance where the government relies on self-reporting. And the considerable risks to efficient government of a self-executing claim of privilege will require acceptance of, at the very least, a use restriction of unspecified dimensions.

402 U.S. at 451–53, 91 S.Ct. at 1549–1550 (footnotes omitted). The resulting limited governmental entitlement to rely on the non-criminalized self-reporting statute in a criminal context, which would be joined and imposed by the suspected (self-reporting) individual, would, Justice Harlan posited, "threaten( ) the capacity of the government to respond to societal needs with a realistic mixture of criminal sanctions and other regulatory devices". 402 U.S. at 452, 91 S.Ct. at 1550. The Justice recognized that his own opinions in the *"Marchetti-Grosso* line of cases" suggested this otherwise undesirable application of the privilege, 402 U.S. at 452–53, 91 S.Ct. at 1550, and drew a bead on the distinguishing factors:

In each of those cases, the Government, relying on its taxing power, undertook to require the individual to focus attention directly on behavior which was immediately recognizable as criminal in virtually

every State in the Union. Since compelled self-reporting is certainly essential to the taxing power, those cases must be taken to stand at least for the proposition that the Fifth Amendment requires some restriction on the efficiency with which government may seek to maximize both noncriminal objectives through self-reporting schemes and enforcement of criminal sanctions.

\* \* \* \* \* \*

The statutory schemes involved in *Marchetti* and related cases ... focused almost exclusively on conduct which was criminal. \* \* \* Although compelled self-reporting is certainly essential to the taxing power, the decision to collect taxes through a special regulatory scheme which conditions the obligation to report on intent to commit a crime or the actual commission of a crime represents a determination to pursue noncriminal/governmental purposes to the entire exclusion of the values protected by the Fifth Amendment. In a very real sense, compliance with the statutory requirements involved in *Marchetti*, and *Grosso*, followed by use of the information in a prosecution reduced the "accusatorial system" to the role of a merely ritualistic confirmation of the "conviction" secured through the exercise of the taxing power. Those statutory schemes are hardly distinguishable from a governmental scheme requiring robbers to register as such for purposes of paying an occupational tax and a tax on the proceeds of their crimes....

In contrast, the "hit-and-run" statute ... predicates the duty to report on the occurrence of an event which cannot, without simply distorting the normal connotations of language, be characterized as "inherently suspect"; *i.e.,* involvement with property damage.

\* \* \* \* \* \*

California's decision to compel Byers to stop after his accident and identify himself will not relieve the State of the duty to determine, entirely by virtue of its own investigation after the coerced stop, whether or not any aspect of Byer's [*sic*: Byers'] behavior was criminal. Nor will it relieve the State of the duty to determine whether the accident which Byers was forced to admit involvement in was proximately related to the aspect of his driving behavior though to be criminal. In short, Byers having once focused attention on himself as an accident-participant, the State must still bear the burden of making the main evidentiary case against Byers as a violator of ... the California Vehicle Code. To characterize this burden as a merely ritualistic confirmation of the conviction secured through compliance with the reporting requirement in issue would be a gross distortion of reality; on the other hand, that characterization of the evidentiary burden on the State and Federal Governments after compliance with the regulatory scheme involved in *Manchetti* and *Grosso* seems proper.

Considering the noncriminal governmental purpose in securing the information, the necessity for self-reporting as a means of securing the information, and the nature of the disclosures involved, I cannot say that the purposes of the Fifth Amendment warrant imposition of a use restriction as a condition on the enforcement of this statute.

402 U.S. at 453–58, 91 S.Ct. at 1550–1553 (footnotes and citations deleted). Justice Harlan, however, recognized the intellectual and moral dilemma of the fifth amendment challenge to a *Byers* -type self-reporting statute which was a direct outgrowth of his own *"Marchetti-Grosso* line of cases". The analytical framework of those cases was incapable of full response to the concerns articulated by the *Byers* plurality opinions. Unfortunately, neither Justice Harlan nor the Chief Justice sufficiently resolved the dilemma by synthesis of the *Sullivan, Albertson, Marchetti, Grosso, Haynes,* and *Byers* opinions. As a result, the appeals and district courts continue to fumble with possible solutions. Somewhat expediently, they have narrowed the inquiry to Justice Harlan's summary of his

extended discussion which listed three elements, (1) governmental purpose, (2) the essential nature of the self-reporting mechanism, and (3) the nature of the disclosures, as the salient factors compelling his decision. Recognizing these elements as reflected in the *Sullivan* analysis, and as also discussed in the Chief Justice's opinion in *Byers,* the lower federal courts have become confident in the employment of that approach in all fifth amendment challenges to legislative enactments mandating self-disclosure. This approach, however, presents serious infirmities.

Just as the *Marchetti-Grosso* reviews failed to give full swing to the legitimate concerns of *Byers*-type enactments, so the *Sullivan-Byers* analysis is an insufficient response to the valid fifth amendment issues raises in the *Marchetti* and *Haynes* circumstances. As previously noted, this failure of universality was duly observed by Justice Harlan, *see* 402 U.S. at 458, 91 S.Ct. at 1553, and was of no small concern to him, as reflected by his *Byers* opinion. The inaptness of a *Byers* analysis to the *Marchetti* situation is apparent from an attempt to apply it.

Considering first the governmental purpose behind the *Marchetti* statute, namely to facilitate the taxing laws, and recognizing that the government is permitted to levy taxes even upon illegal enterprises, it is obvious that the self-reporting requirement advanced a significant and legitimate government interest. It is true that the *Marchetti* tax was applied against a highly select group of individuals inherently suspected of criminal activity; however, that is, by definition, true of any tax on illegal activity. Given that the government is authorized to levy such a tax, it seems more than slightly inconsistent to invalidate collection of the tax because it is imposed upon criminals. The same analysis holds for the concern that the taxed occupation is permeated with criminal legislation.

The necessity of self-reporting for the success of the legitimate statutory purpose, the second element in the *Byers* balance, is self-evident. Self-reporting is the cornerstone of this nation's taxing scheme. Without it, a reliable tax structure could not exist. Accordingly, the *Byers* analysis would favor the constitutionality of the *Marchetti* statute on this prong as well.

Finally, *Byers* directs an examination of the "nature" of the disclosure at issue. The inquiry becomes whether compliance will result in a prosecution or in criminal charges which would not otherwise be suffered. In *Marchetti,* as in *Byers,* the answer was in the affirmative. However, as explained by the Chief Justice, the existence of such a threat does not always outweigh the societal needs registered in the self-reporting enactment.

Absent definitive guidance from the Supreme Court, the courts of appeals are left to individually interpret these pertinent Supreme Court decisions in order to develop a unified analysis which can satisfactorily account for the diverse principles which may arise in cases charging fifth amendment challenges to statutory self-reporting requirements.

As relevant to the case at bar, the fifth amendment prohibits government compelled incriminating evidence. In *Marchetti, Grosso,* and *Haynes,* the statutory scheme demanded direct admission of criminal conduct (albeit prospective) and the self-reporting requirements were therefore voided as transgressing the constitutional prohibition. Therefore, when presented with a fifth amendment challenge to self-reporting statutes, the first inquiry must be directed to the nature of the admission mandated. If the admission appears incriminatory on its face, for example, by directing disclosure of personal criminal conduct or contemplated criminal conduct, by significantly enhancing the likelihood of prosecution, or by providing direct evidence which will facilitate a conviction, then the fifth amendment issue is resolved: the compelled disclosure is unconstitutional. In such instances the fifth amendment's protection is absolute.

However, as the "directness" of the admission of criminal enterprise diminishes, the more obscure the applicability of the

fifth amendment becomes. Thus, a more precise evaluation of the relevant elements is necessary to equate the constitutional right to silence against the government's demand for disclosure. Various legitimate interests authorize the government to query citizens under the appropriate circumstances; the point at which the testimonial circumstances transgress constitutional propriety is the issue addressed by *Sullivan* and *Byers*. In my view the gravamen of this case is not whether the fifth amendment should apply, but whether it does in fact apply.[4] The *dicta* in *Albertson*, which analyzed the government's *Sullivan* analogy and found it wanting, sufficiently identified the factual elements to be scrutinized in order for a court to evaluate the "uncertain ... constitutional mandate derived from this portion of the Bill of Rights" and, cognizant of the legitimate interests at stake, "to seek that line of accommodation which will render this provision relevant to contemporary conditions". *California v. Byers*, 402 U.S. at 454, 91 S.Ct. at 1551 (opinion of Harlan, J.).

When Justice Harlan noted that "we must deal in degrees in this troublesome area", *id.*, he recognized that if the compelled disclosure was not facially incriminatory under constitutional standards, then,

by definition, those legitimate governmental interests which informed the *Sullivan* and *Byers* cases were implicated. As a result, it would then be entirely appropriate to invoke the framework prescribed by those cases. Of the cases hereinbefore discussed, *Sullivan* and *Byers* fit this mold, while *Albertson* (Communist Party membership) arguably, and at least technically, would also be within orbit. The analysis which results from colligation of the *Sullivan*, *Albertson*, and *Byers* cases comports with the above-described standard extracted from *Byers*. Essentially, the review mandated in cases of this sort suggests a three-part investigation.[5]

First, the statutory scheme itself must be examined. This requires identification of various interests and policies advanced by the enactment. Together with those elements (which, it goes without saying, must represent legitimate governmental objectives), the court must evaluate the effectiveness and importance of the self-reporting requirement *vis a vis* those interests and policies. The cases reflect two objectives of this review: (a) it is necessary to determine if self-disclosure is at all necessary to the statutory scheme and, if it is, to what degree; (b) to assist resolution of the issue as to when and how the fifth

---

**4.** In *Byers*, the Chief Justice advanced this elemental analysis in terms of "balancing". Any application of this balancing or evaluative scheme must be undertaken only upon discerning that, facially or directly, the fifth amendment is not apparently implicated. If fifth amendment review predisposes to "balance" the privilege against societal interests, then soon that portion of the Bill of Rights will be balanced out of existence. Hence my insistence that the *Byers*-type review is useful to enable a lower court to evaluate a facially legitimate governmental inquiry of a citizen to determine if protection against incriminating disclosure has been contravened.

**5.** In *Byers*, the Chief Justice articulated the need for this review with appropriate posturing:

Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of

balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.

An organized society imposes many burdens on its constituents. It commands the filing of tax returns for income .... Those who borrow money on the public market or issue securities for sale to the public must file various information reports .... Comparable examples are legion.

In each of these situations there is some possibility of prosecution—often a very real one—for criminal offenses disclosed by or deriving from the information that the law compels a person to supply. Information revealed by these reports could well be "a link in the chain" of evidence leading to prosecution and conviction. But under our holding the *mere possibility* of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here.

amendment claim should be raised. Generally, if the statutes represent legitimate government objectives to which self-reporting is essential, then the declarant would be permitted to submit specific fifth amendment claims to some tribunal (usually the agency charged to collect the forms) as against totally evading the requirement to register. *E.g., Sullivan; Byers. Cf. Albertson.*

Second, the court is charged with the responsibility to evaluate the nature of the disclosure which is compelled. Two aspects of the required registration are here relevant: (a) the identity of those required to register; (b) the area of application, that is, the class of conduct which raises the spectre of the statute. The thrust of the inquiry is to determine if the filing requirements are imposed upon the public at large or upon a select group generally associated with criminal conduct. If the latter, unconstitutionality is suspect. Similarly, in (b) above the inquiry endeavors to determine if the registration is required in an area essentially regulatory and not generally criminalized, or in an area permeated with criminal proscription. The more "regulatory" the inquisition the stronger the government's case for upholding the constitutionality of the statute.

The third inquiry charges the court to integrate its initial findings and determine if compliance with the statute may involve the subject individuals in the admission of a crucial element of a crime. To accomplish this task, the court must consider the facially neutral questions in context. *Byers* and *Sullivan* are excellent applications of the foregoing analysis. In context, the identification required of the California driver, while promising to make him the focus of the investigation, was essentially neutral in the criminal law sense.

Similarly, in *Sullivan,* where the bootlegger sought to avoid filing a return, the privilege was found not to attach. As explained by the *Albertson* Court, the *Sullivan* result was mandated because of the highly regulated and non-criminalized nature of the facially neutral income tax return. In context, mere identification of income did not affirmatively and significantly contribute to potential state prosecution of illegal traffic in liquor.

Each fifth amendment analysis thus presented offers a workable mode in which to discern "whether the claimant is confronted by substantial, and 'real' and not merely trifling or imaginary, hazards of incrimination", which is the standard by which application of the privilege is to be resolved. *United States v. Apfelbaum,* 445 U.S. 115, 128, 100 S.Ct. 948, 956, 63 L.Ed.2d 250 (1980). The point of departure for this review is the disclosure compelled by the statute under which the appellee was convicted.

Section 922(e) incorporates two provisions; each of which impose distinct obligations on a very diverse class of individuals, therefore, each section must be separately scrutinized. The first section relevantly provides as follows:

> It shall be unlawful for any person knowingly to deliver ... to any common ... carrier for transportation [in] foreign commerce, to persons other than licensed importers, licensed manufacturers, or licensed collectors, ... any firearm ... without written notice to the carrier that such firearm ... is being transported ...

18 U.S.C. § 922(e). Section 922(a)(1) of the act declares that it is unlawful for any person other than a licensed person to ship firearms in interstate or foreign commerce; the same subsection, § 922(a)(2), further directs that shipment of firearms in interstate or foreign commerce may be legally accomplished only if shipped to a licensed importer, manufacturer, or collector. As a result, any person shipping a firearm to one other than a licensed recipient violates a federal criminal statute.

Section 922(e) requires that a person file the disclosure of shipment if that person is shipping the firearm to one other than a licensed recipient. The disclosure mandated under § 922(e) is therefore a direct ad-

mission of criminal conduct.[6] Thus, this portion of § 922(e) on its face violates the fifth amendment rights of those required to report thereunder and is, indeed, legally indistinguishable from the reporting requirement invalidated by *Haynes.*

As the majority has noted, the government urges this court to adopt the Fourth Circuit's rationale in *United States v. Wilson,* 721 F.2d 967 (4th Cir.1983). In that case, the Fourth Circuit apparently assumed § 922(e) required incriminating reporting (the opinion itself is unstructured and obscure on this issue) but concluded that it was not an unconstitutional requirement because the statute directed the incriminating evidence be tendered to the carrier. 721 F.2d at 974. That opinion turned on an entirely irrelevant distinction, namely the depository for the compelled admission. The fifth amendment protects against coerced self-incrimination by the government. The ultimate fifth amendment inquiry is whether the defendant has been "compelled in any criminal case to be a witness against himself"; the Fourth Circuit unjustifiably amended this inquiry to permit a government to coerce incriminating testimony so long as the depository for the statement was not the government itself. Under all the above-discussed articulations of the self-incrimination issue, the only concern was with the nature of the testimony: "is it incriminating?", and

"does the government compel it?". No court has to this date suggested that the Congress may insulate a compelled disclosure statute from the fifth amendment attack by the tactic of creating a non-governmental repository for the disclosures.

The Fourth Circuit's determination that no fifth amendment infringement was present under circumstances where the incriminating information was mandated to be disclosed to a private party is contrary to every principle associated with the fifth amendment's guarantee of the liberty to remain silent. Justice Harlan, discussing the privacy aspects of the privilege, noted that the privilege extended "to witnesses in *civil* lawsuits ... a context in which ... information is sought by a *private* party wholly for purposes of resolving a private dispute". 402 U.S. at 450, 91 S.Ct. at 1549 (emphasis added). The principle is hardly new or remarkable, *see McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924) (Brandeis, J.) ("[t]he privilege is not ordinarily dependent upon the nature of the proceeding.... It applies ... *wherever* the answer might tend to subject to criminal responsibility him who gives it"), and it is surprising that the Fourth Circuit, and others, have so uncritically accepted a fallacious doctrine.

This distinction lacks logical support even within the narrow confines of the act,

**6.** Compliance with the written-notice proviso is the equivalent of confessing to violations of a variety of crime. The possible federal violations include 18 U.S.C. § 922(a)(5) (unlawful for non-licensed dealer to transport firearms to an unlicensed dealer); and 18 U.S.C. § 922(a)(1) (a transportation of firearms in commerce by unlicensed dealer is unlawful). In addition, the written notice would support transgressions of relevant federal regulations, including 22 C.F.R. 122.01, 123.01, 127.01 (exportation without license); 27 C.F.R. 178.31(a) (associated with § 922(e)); and, 27 C.F.R. 178.30 (associated with § 922(a)(5)).

The U.S. Attorney urges that unlicensed lawful shippers are provided for in § 922 and not excluded from the reporting requirement of § 922(e). Brief at 11. First, it is unclear that the government's reading of the statute is correct. For example, the government notes that an owner of the firearm may transport guns for personal use without violating the statute.

However, this procedure is provided under the second section of the statute, which will be presently addressed. In addition, as I read the statute, the government incorrectly asserts that a licensed dealer lawfully shipping a firearm to a legal recipient must register *per* § 922(e). Second, in all of the tax and firearms cases, the Court has made allowances for legal operations nonetheless subject to the reporting requirement but, in view of the criminalized nature and intent of those statutes, considered the incidental inclusion of innocent individuals within the statute's scope to be without effect on the validity of the fifth amendment analysis. Cf. n. 2 *supra;* n. 7 *infra.* The statute at bar, like those in *Marchetti, Grosso, Hayes,* and *Albertson,* was designed to focus on and compel incriminating statements. This is several times conceded, perhaps unwittingly, by the government in its brief. *See, e.g.,* Brief at 12 ("the primary purpose of § 922(e) was to enable carriers ... to refuse unlawful shipments").

which obviously contemplates governmental awareness of these filings as well as access to carrier records. Elsewise, no criminal conviction could ever be obtained.[7]

Also, it must be observed that at no point in any of the *Byers* opinions did the Court suggest that the hit-and-run statute was upheld because the identification was required to be tendered a third party. An incriminating statement is no less incriminating when delivered to a civilian; similarly, a government-coerced confession is no less coerced when forced to be given over to a common carrier.

The Fourth Circuit arrived at its decision as a result of its attempted analogy of fourth amendment search cases to the fifth amendment. Because warrantless searches by common carriers are not subject to fourth amendment exclusion, the Fourth Circuit reasoned, coerced testimony to common carriers can not implicate the fifth amendment. This is, at best, strained reasoning. The fourth amendment protects against unauthorized government searches—thus the appropriate issue concerns whether the government conducted the search. The fifth amendment, obviously, protects against government coercion. The fourth amendment analysis might assist a court where some indirect governmental coercion involved sufficient government action to invoke the fifth amendment; that, however, is a long way from the case where the compelled testimony results from statutory command. While this fourth amendment analysis may be necessary to determine whether state action was involved in a search, in this fifth amendment context there is no question that the state has acted.

In view of the foregoing, I am unable to accept the premises, standards and conclusions as declared by the Fourth Circuit with respect to the constitutionality of the written notice provision of § 922(e).[8] How-

---

7. In *Marchetti*, the Court, aware that the incriminating statement was not directly submitted to either state or federal prosecutors, nonetheless found the statements unconstitutionally extracted because the declarant "was required, on pain of criminal prosecution, to provide information which he might *reasonably suspect* would be *available* to prosecuting authorities". In the case at bar there exists much more than a reasonable suspicion that the written confession would be available to federal and state authorities.

8. Despite the fact that I also would reverse the trial court's order of acquittal in this case, I think it necessary and prudent to briefly address the government's argument that appellee has waived the protection of the fifth amendment in this case. If the government is correct, then the constitutionality of the statute was improperly considered below and may not be determined by this tribunal.

The government urges that the fifth amendment issue was either waived or untimely presented and should not therefore be entertained on the appeal. It will be recalled that Alkhafaji presented the constitutional attack on the statute after the verdict but prior to judgment and sentencing. Prior to his trial, no court had established a fifth amendment defense to a § 922(e) conviction. Then the Ninth Circuit decided *Flores,* which Alkhafaji in turn urged, successfully, upon the trial court.

The government argues that Alkahafaji's trial testimony conflicted with his claim that the statute was unconstitutional. Alkhafaji had tes-

tified that he attempted to obtain information about restrictions on the shipping of firearms before he presented the guns for export. He claimed he relied on misleading responses by governmental officials in believing he was not acting in contravention of any law. (The jury probably credited this testimony, as it acquitted him on Count I.) The government asserted below, and maintains here, that Alkhafaji thus waived his self-incrimination defense.

However, the relevant general principle is that "the mere failure to interpose ... a [constitutional] defense prior to the announcement of a decision which might support it cannot prevent a litigant from later invoking such a ground. Of course, it is equally clear that even constitutional objections may be waived by a failure to raise them at a proper time, but an effective waiver must, ... be one of a 'known right or privilege.'" *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 143, 87 S.Ct. 1975, 1985, 18 L.Ed.2d 1094 (1967) (citations and footnotes deleted) (plurality decision).

First, as in *Curtis Publishing Co. v. Butts,* it can hardly be said that (prior to *Flores* at least) the constitutional defense to a § 922(e) conviction was a "known right or privilege" effectively waived by the defendant's claim that he lacked an intent to violate any known law. Second, that defense is in no manner *ipso facto* contradictory of the argument that the law itself is unconstitutional. Third, Alkhafaji's constitutional points were raised without delay and early enough so that this court has had the benefit of exposition by the trial court; further, the

ever, because I view this appellee's conviction as constitutionally obtained pursuant to the more neutral requirement contained in the latter section of § 922(e), I concur in the result reached by the majority in this court.

The second section of § 922(e) addressed passengers who travel with firearms which they "own or legally possess".[9] Such passengers are required to disclose and deliver the firearm or firearms to the control of the carrier for the duration of the flight; unlike the first section of § 922(e), no criminal association is made a predicate of compliance.[10] Further, while the first section of the statute was designed to ferret illegal transactions, the purpose of the passenger provision was designed to ferret illegal transactions, the purpose of the passenger provision was to permit greater flexibility for the legal transportation of firearms. *See United States v. Burton*, 351 F.Supp. 1372, 1377 (W.D.Missouri 1972), *aff'd*, 475 F.2d 469 (8th Cir.), *cert. denied*, 414 U.S.

835, 94 S.Ct. 178, 38 L.Ed.2d 70 (1973). In appropriate parlance, the written-notice clause is a criminalized statute by design and effect, while the passenger requirement is essentially regulatory and neutral in purpose and result.

Further, the "disclosure and surrender control" provision being fully applicable to every carrier passenger regardless of criminal backgrounds, insulates the statute from the charge that it is narrowly directed at an inherently suspect criminal group. There is no "focus ... on behavior ... immediately recognizable as criminal", those who comply run no greater risk of reducing "the 'accusatorial system' to the role of a merely ritualistic confirmation of the 'conviction' secured through the" admission than did the *Byers* driver.

Certainly, the disclosure and delivery has an incriminating potential; however because it is divorced from admissions of criminality (as opposed to the written-notice

protection against compelled self-incrimination is a "valued freedom", the waiver of which may not be found "in circumstances which fall short of being clear and compelling". *Curtis Publishing Co. v. Butts,* 388 U.S. at 145, 87 S.Ct. at 1986.

The procedural questions appear, however, to be purely academic pursuant to the *Curtis Publishing* opinion and the cases cited therein. The threshold requirement under any *Curtis Publishing* waiver is the intentional relinquishment of an established constitutional defense; as previously examined, in the case at bar there was no such waiver. Assuming there was a waiver in the failure to articulate the defense prior to trial, *Curtis Publishing's* alternative rationale would permit its presentation in the manner utilized in this case:

> Our rejection of Butts' arguments [of waiver] is supported by factors which point to the justice of what conclusion. See *Hormel v. Helvering*, 312 U.S. 552, 556–557, 61 S.Ct. 719, 721, 85 L.Ed. 1037. Curtis' constitutional points were raised early enough so that this Court has had the benefit of some ventilation of them by the courts below. The resolution of the merits of Curtis' contentions by the District Court makes it evident that Butts was not prejudiced by the time at which Curtis raised its argument .... Finally the constitutional protection which Butts contends that Curtis has waived [is a] ... valued freedom....

388 U.S. at 145, 87 S.Ct. at 1986. These factors, previously addressed, weigh in favor of appellee (while the existence of "prejudice" is not evalu-

ated by the parties, no party can be prejudiced if Alkhafaji's presentation of his claim prevents an unconstitutional conviction). Accordingly, there was no effective waiver and the constitutionality of the statute is appropriately at bar.

9. Pertinently, the statute states:

> except that any passenger who owns or legally possesses a firearm ... being transported aboard any common ... carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm ... into the custody of the pilot, captain, conductor, or operator of such ... carrier for the duration of the trip without violating any of the provisions of this chapter.

Thus the act excuses the need for incriminating written admissions because deliverance of the gun is not predicated upon the illegality of the shipment and imposes an affirmative obligation upon passengers to surrender their firearms to the control of designated employees of the carrier. As will be seen, in scope, character, and effect, this proviso is entirely distinct from the written notice requirement.

10. A further point of note is that this second section of the statute is not satisfied if the traveler merely delivers luggage containing the firearms to the carrier's control. That such a reading would be inconsistent with the statutory language and congressional intent has been soundly established by *United States v. Burton, supra*.

requirement which is wedded to criminal activity), the disclosure and delivery of custody *simpliciter* does not equal the admission of a crime, nor does it, by itself, "significantly enhance the likelihood of prosecution". Also, as in *Byers*, prosecution of a passenger under this second section would necessitate the development of substantial independent incriminating evidence to secure a conviction for the illegal transportation of firearms. Accordingly, on review of this section of the statute it is entirely appropriate to adopt the teachings of both Chief Justice Burger and Justice Harlan, and examine the facticities of the disclosure in context.

The primary basis for this statutory scheme was to permit effective federal regulation of firearms commerce and to assist the states in enforcing their own firearm regulations. There was not expressed any congressional concern regarding the section's potential for aiding law enforcement efforts to combat hijacking. Nonetheless, heeding (in a slightly different context) Justice Harlan's entreaty "to seek that line of accommodation which will render this provision relevant to contemporary conditions", *California v. Byers*, 402 U.S. at 454, 91 S.Ct. at 1551, courts should not be blind to developments in the years since passage of the act, which make passenger access to firearms a matter of crucial concern to every member of society. Viewed against a modern backdrop of transnational terrorism and other threats to the security and safety of air carrier passengers, the facially neutral, primarily regulatory, second provision of § 922(e) raises little constitutional suspicion.

In sum, when a passenger is called upon to disclose and deliver custody of a firearm to the carrier no admission of criminal activity is apparent. Further, while the possession thus disclosed may focus on the passenger the attention of law enforcement authorities and may eventually support a criminal conviction, that eventuality is not, considering the essentially neutral "testimony" compelled, the necessity of compliance to secure the important information sought, and the generally regulatory na-

ture of requirement, in itself sufficient implication of fifth amendment protections to void the compelled disclosure in this case.

Because the appellee was properly convicted under the passage of § 922(e) applicable to passengers I would, notwithstanding the doubtful propriety of the first part of that enactment, reverse the trial court and reinstate the jury verdict.